UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

C.D. and R.D., individually and on behalf of their
minor E.D.,

          Plaintiffs,

      -against-

The Bedford Central School District,

         Defendant.

------------------------------------------------------------------------ x

USDS SDN.
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9|22|11

10 Civ. 5502 (CM)

### DECISION AND ORDER GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

    Plaintiffs, C.D. and R.D., on behalf of their minor son, E.D., have filed a complaint

against the defendant school district pursuant to the Individuals with Disabilities Education Act,

20 U.S.C. Section 1401, *et seq.* (the "IDEA").

    Plaintiffs commenced this action to seek review of the determination of the State Review

Officer for the New York State Education Department (the "SRO"), who concluded that they

were not entitled to tuition reimbursement for unilaterally placing their son at a private special

education school located in Norwalk, Connecticut, known as the Winston Preparatory School

("Winston Prep"), for the 2007-2008 and 2008-2009 school years.  Specifically, the SRO

concluded (as had the Independent Hearing Officer before him), that the programs recommended

for E.D. in the Individualized Education Plan ("IEP") formulated by the district's Committee on

("CRE") for the 2007-2008 and 2008-2009 school years offered E.D. a free and appropriate

public education ("FAPE"), in that they offered individualized educational programs that were

designed to meet the unique needs of E.D. and calculated to confer educational benefits on the

child in the least restrictive environment.

The SRO Decision is well-reasoned, thorough and persuasive. Credible record evidence supports every one of the SRO's findings and conclusions. In fact, I can fairly say that it is the single finest SRO Decision this Court has reviewed in some 13 years of hearing appeals from such decisions. It is entitled to the deference I accord it.

For the reasons set forth below, the Court affirms the determination of the SRO, grants the defendant District's cross motion for summary judgment, and denies the plaintiffs' motion for summary judgment.

**Statement of Facts**

As is almost always the case, the facts in this IDEA appeal are largely undisputed, and I cannot recite them better than did the SRO in his decision. I therefore adopt as my statement of facts the exhaustive recitation of the underlying facts contained in the SRO's decision (No. 10-012), commencing at page 1 and continuing through the middle of page 14. The record citations throughout amply support the individual statements of fact contained therein. I note that many of the most salient facts are repeated during the SRO's discussion of his ultimate findings.

**Conclusions of Law**

When an action is brought under the IDEA to appeal a final decision of the SRO, the Second Circuit has recognized summary judgment as the procedural mechanism for reviewing such administrative decisions. *A.C. ex rel. M.C. v. Board of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009). However, "'the role of the federal courts in reviewing state education decisions under the IDEA is circumscribed.'" *Id., quoting Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007). While this Court must engage in an independent review of the Record, and make a determination based on a preponderance of the evidence, in so doing, it may not substitute its own notion(s) of sound educational policy for those of the school authorities being reviewed. *A.C. ex rel. M.C.*, 553 F.3d at 171, *citing Board*

*of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982); *see also A.H. ex rel. J.H. v. Department of Educ. of City of New York*, 2010 WL 3242234, *1 (2d Cir. Aug. 16, 2010). In fact, the Second Circuit has determined that "it is critical to recall that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy." *Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 191 (2d Cir. 2005).

Deference must be given to state administrative bodies because, as the Supreme Court has cautioned, the judiciary generally "lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Gagliardo*, 489 F.3d at 113, *quoting Rowley*, 458 U.S. at 206, 208; *see also A.C. ex rel. M.C.*, 553 F.3d at 171. Courts therefore defer to the final decision of the state authorities, which in this instant is the SRO's Decision. *See R.R. ex rel. M.R. v. Scarsdale Union Free Sch. Dist.*, 366 Fed. Appx. 239, 2010 WL 565659, *2 (2d Cir. Feb. 18, 2010), *quoting A.C. ex rel. M.C.*, 553 F.3d at 171; *M.F. v. Irvington Union Free Sch. Dist.,* 719 F. Supp. 2d 302, 307 (S.D.N.Y. 2010).

To determine whether the parents are entitled to tuition reimbursement, the Second Circuit engages in a three (3) step process. *A.C. ex rel. M.C.*, 553 F.3d at 171, *citing Cerra,* 427 F.3d at 192; *see also T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009). First, it determines whether the proposed IEP was developed in compliance with the procedures set forth in the IDEA. Second, it determines "whether the proposed IEP is substantively appropriate in that it is 'reasonably calculated to enable the child to receive educational benefits.'" *Id., quoting Rowley*, 458 U.S. at 206-207. If the first two steps are answered affirmatively, then the obligations imposed by the IDEA have been satisfied and nothing more can be required from the District. *See Cerra*, 427 F.3d at 192. Only if the IEP is procedurally or substantively deficient is the third step reached, which assesses whether the

private placement and/or services are appropriate to the child's needs and the extent to which equitable considerations support the reasonableness of the parents actions. *A.C. ex rel. M.C.*, 553 F.3d at 171, *citing Cerra,* 427 F.3d at 192 and *citing Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 363-64 (2d Cir. 2006), *cert. denied* 552 U.S. 985 (2007).

The SRO determined that the District's recommended programs for the 2007-2008 and 2008-2009 school years offered E.D. a free and appropriate public education. (Decision of the State Review Officer at page 39[1]).

To be successful in this proceeding, the District has the burden to show that it offered E.D. a free and appropriate public education ("FAPE"). A District provides a FAPE when "(a) the board of education complied with the procedural requirements set forth in IDEA, and (b) the IEP developed by its [Committee on Special Education ("CSE")] through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits.'" *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982). The Court of Appeals has found that a school district meets its obligations towards a student if the program recommended by the CSE is "likely to produce progress, not regression." *Walczak v. Florida Union Free School Dist.,* 414 F.3d 119, 130 (2d Cir. 1998). There is no requirement to "maximize the potential of a student with a disability." Instead, the District is required to provide a program wherein the student can make meaningful progress. *Rowley, supra.*

As the Courts have held, the central purpose of the Individuals with Disabilities Education Act ("IDEA") is to ensure that students with disabilities have available to them a FAPE. *Schaffer v. Weast*, 126 S. Ct. 528, 531 (2005); *Bd. of Educ Rowley*, 458 U.S. 176, 179-81, 200-01 (1982); *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 371 (2d Cir. 2006). The IDEA

---

[1] Hereinafter references to the State Review Officer's decision will be noted as "SRO Dec. p. [ ]".

requires that the FAPE the District is required to offer be in the least restrictive environment.  20

U.S.C. §1412(a)(5)(A); 34 C.F.R. §§300.114(a)(2)(i), 300.116(a)(2); 8 NYCRR 200.6(a)(1); *see*

*Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir. 1998).  A least restrictive

environment is, "one that, to the greatest extent possible, satisfactorily educates disabled children

together with children who are not disabled, in the same school the disabled child would attend if

the child were not disabled." *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 535 (3d Cir. 1995).

IDEA does not specify any particular level of educational benefit that must be provided

by the recommended program.  *Rowley*, 458 U.S. at 189; *Walczak*, 142 F.3d at 130.  However,

the Supreme Court has found that a district is not required to maximize a disabled student's

performance in the educational setting. *Rowley*, 458 U.S. at 197 n.21, 189, 199; *see also*, *Grim v.*

*Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003); *Walczak*, 142 F.3d at 132.  In other

words, the law only requires the District to provide an appropriate education, "not one that

provides everything that might be thought desirable by loving parents." *Tucker v. Bay Shore*

*Union Free Sch. Dist.*, 873 F.2d 563, 567 (2d Cir. 1989).  Therefore, a District meets its

obligation under the IDEA if it provides, "personalized instruction with sufficient support

services to permit the child to benefit educationally from that instruction." *Rowley*, 458 U.S. at

203.

In this case, the SRO concluded that the District had offered E.D. a FAPE for the two

school years in question. After reviewing his decision and the record, I cannot quarrel with that

conclusion.

### The CSE's Recommendations for E.D.'s English
### Language Arts Instruction were Appropriate

The record includes ample evidence that the programs recommended for E.D. were

appropriate for E.D. and designed so that he could benefit educationally.  In each year in

question, E.D. was recommended for a daily period of English to be taught by a special education teacher and regular education teacher in a co-teaching model. (D-7; 23). As Laurie Bauer, the Assistant Director of Special Education, explained, each co-teach class at Fox Lane Middle School ("FLMS") has a learning specialist, who is a certified special education teacher, working daily on instructional strategies geared towards the classified students in the class. (T.50- 51). For E.D.'s English co-teach classes, there were no more than six special education students, so E.D. would receive small group attention by a special education teacher during English class every day. (T.52;124). This instruction is provided using a multi-sensory approach. (T.195-96).

Ms. Burke, E.D.'s special education teacher for sixth grade, described the role of the learning specialist in the co-teach English class. The special education teacher and regular education teacher, who collaborate on instruction, have a common preparation period daily to plan the upcoming learning unit. Accommodations for the classified students are discussed so that instruction proceeds smoothly. For instance, instructional material is modified so it is on the classified students' instructional levels. For writing, assignments are also modified – in E.D.'s case, Ms. Burke would insure his paragraphs were scaffolded to provide him with the organizational support he required. (T.392). Ms. Burke also testified as to how she, as the special education instructor, would insure that E.D. would remain on task and attempt to control his impulsivity. (T.393-94).

For the 2008-2009 school year, the English co-teach class was recommended, despite the student's demonstrated strengths in reading and writing, because the CSE "felt he needed the presence of a special educator to offer the special instruction so that he could see it, hear it, do it, and also address the attentional and impulsive – impulsivity behaviors." (T.218). This

recommendation was supported by the reports from Winston Prep which indicated that while he was making progress and had shorn up his reading and writing skills, he still had deficits in comprehending non-fiction texts and needed support in writing.

These reports were consistent with E.D.'s documented needs established in objective testing. E.D. received a Level "3" score on his English Language Arts state assessment in both 5th and 6th grades, which means that he was meeting state standards. (T.55). Additionally, E.D.'s education re-evaluation (D-37), administered in the fall of 2006, revealed that his overall reading skills were in the average range, albeit with some weaknesses in comprehension. (T.62). Even the testing by Plaintiffs' independent evaluator, Dr. Judith Moskowitz, indicated solidly average reading scores. (D-53). Clearly, the reports of his educators, along with the test scores, support the recommendation of an English class where he could maintain contact with his mainstream peers while enjoying the benefit of a special education teacher at all times.

### The CSE's Recommendations for E.D.'s Math Instruction were Appropriate

The CSE appropriately recommended that E.D. be educated in a co-teach math class for each year in question. In this class, a full-time certified math teacher and a full-time special education teacher worked with students on a daily basis. (T.203). The same collaborative approach used in the English classes was to be utilized. For the 2008-2009 school year, the CSE "felt that [E.D.] needed access to a math certified teacher with the special education teacher present every single day to offer that specialized instruction." (T.218). This recommendation was supported by the report from Winston Prep, which stated that E.D. still required help in acquiring basic math fluency, as well as help with word problems.

The CSE made the determination to place him in this model rather than a self contained math class for numerous reasons, one of which was the IDEA-imposed obligation to provide a

program in the least restrictive environment – i.e., not to warehouse the student in a special

school if at all possible.  (T.75).  The CSE recognized that in the co-teach model, E.D. would

enjoy the support of a special education teacher on a daily basis, yet still have access to his

regular education peers during instruction.  In E.D.'s case, the special education teacher would

only be responsible for four classified students in this class. (T.75).

### The CSE's Recommendations for E.D.'s other Content
### Area Classes were Appropriate

The recommendations for a consultant teacher direct model for Social Studies and

Science were also grounded in evidence provided to the CSE.  In the consultant teacher direct

model, a special education teacher is in those classes every other day to educate the small

number of classified students in the class.  On the days when the consultant teacher is not

present, an instructional aide is in the classroom.  (T.49).  There are no more than six special

education students in the consultant teacher direct classes at FLMS.  (T.125).  The special

education teacher is charged with collaborating with the regular education teacher to make sure

that all curriculum and instructional materials are modified to the classified students' needs.

(T.49).  All assignments and assessments are also modified to fit the unique needs of the students

in those classes.  (T.50).

For both years in question, in addition to the special education programming

recommended by the CSE, E.D. was also scheduled to be enrolled in a building level support

class, called the CORE class.  The CORE class was described at the CSE meeting to Plaintiffs as

a period in which a special education teacher would work with E.D. to "review, preview, reteach,

do study skills, skill remediation."  (T.253).  This class provides further support for special

education students such as E.D. in his content area classes, allowing his special education teacher

to reinforce concepts, as well as preview materials.  Further, E.D. was to have participated in a

Communications Arts Workshop. This class focuses on reading, writing, speaking and listening strategies for students. (T.200). The class is conducted by a reading specialist and, in E.D.'s case, his speech and language therapist. (T.200).

### The CSE's Recommendations Supported E.D.'s Language Deficiencies

The CSE's recommended programs for both years to address E.D.'s language deficits, as revealed by the speech and language evaluation that were performed during his re-evaluation. These deficits particularly manifested themselves in the word retrieval area and auditory processing. (T.65). Given these needs, the CSE recommended speech and language services on a weekly basis for the 2007-2008 and the 2008-2009 school years. This was an appropriate way to help E.D. organize his thoughts and help him with pragmatic language skills.

For the 2007-2008 school year, Ms. Bauer testified that the program "addressed his academic strengths, his weaknesses, gave him appropriate level of support and remediation, and helped him to increasingly access the general education curriculum." (T.77). Ms. Burke, E.D.'s special education teacher in sixth grade, was in agreement with the recommendation, because E.D. would be receiving appropriate support, given the progress he made during the sixth grade year. (T.427-28). In sixth grade, E.D. demonstrated solid decoding skills, solid literal comprehension skills, and he was making progress in his written language skills. (T.201). His areas of concern, namely math and his attentional issues, were addressed fully through the modifications and accommodations recommended.

Given all the evidence presented, the SRO agreed with the IHO that, from an academic standpoint, the recommended program was appropriate for E.D. (SRO Dec. pp. 33, 37; IHO Dec. p. 77-79). The SRO's ruling is entitled to deference unless his conclusion finds no support in the evidence. In fact, there is ample support in the evidence for the CSE's conclusion.

**The Lack of a 1:1 Aide Did Not Render the IEP Inadequate to Provide a FAPE**

The Plaintiffs' principal objection to the IEPs is that neither of them provided for a 1:1 aide after E.D. transitioned to Fox Lane Middle School ("FLMS"). E.D. had such an aide assigned to him when he was in elementary school. The District maintains that E.D. did not need such support during his time at FLMS and the SRO specifically and emphatically agreed. There is unquestionably substantial evidence in the record to support their determination.

The key differences between the elementary and middle school programs meant that E.D. did not require an aide during his time at FLMS. (SRO Dec. p. 31) When E.D. was in elementary school he was in a mainstream classroom without a special education teacher or any special education personnel academic support. There was one regular education teacher responsible for a class of up to twenty-five students. In that setting, the CSE determined E.D. should have a 1:1 aide to help him with refocusing and remaining on task. (T.45). However, in the programs recommended by the CSE for the 2007-2008 and the 2008-2009 school years, E.D. was never to be taught solely by a regular education teacher. E.D. had the benefit of a special education teacher to provide direct instruction and monitor his behavior in each and every English and Math class. The special education teachers in the co-teach English and Math class are only responsible for up to six special education students. In terms of Science and Social Studies, E.D. had the benefit of either a special education teacher or an Instructional Assistant on a daily basis, again with a responsibility of up to six students. While responsibility for multiple students meant that E.D. would not have enjoyed the undivided attention of the special education teacher or assistant, the CSE determined that the program it was recommending for E.D. "would provide the support and structure he needed without the need for an individual aide." (T. 284).

The CSE that recommended his program for 2006-2007 (his sixth grade year) did consider whether E.D. continued to need a 1:1 aide as he transitioned to the FLMS. It was determined that he did not need such support. (T.128; 283-84). When E.D. had difficulties transitioning between classes, the District did not hesitate to provide an aide to assist with his movements between classes. (T. 191).

### The Fall-Off in Some of E.D.'s Grades at the End of Sixth Grade Does Not Warrant Finding that the District Failed to Offer Him a FAPE

The parents argue that E.D.'s grades, which fell off toward the end of the 2006-2007 school year, undercut any inference that could be drawn in favor of the IEP from the record evidence. And indeed, E.D.'s marks during the fourth and final marking period of the school year included Ds in three subjects (ELA, science and social studies); two marking periods earlier his marks had included two Cs (social studies and ELA), two C+ (science and unified arts), and a B (math). However, as is set forth in great detail in the SRO's laboriously reasoned decision, the record reveals that E.D. obtained his highest math grade – the subject in which he ordinarily performed most poorly – during the same last marking period of the 2006-2007 school year, and earned special kudos from his math teacher, who noted, "When he tells himself he can do it – he does!" E.D. also earned high marks in industrial arts and unified art classes, raising his score in the latter from a C+ during the second marking period to an A. E.D. also scored a "3" (meets state standards) in his January 2007 ELA exam. His teachers described him as curious and interested in the content of his work. Further, E.D.'s conduct and effort scores were generally satisfactory throughout the year.

In the three classes in which his performance flagged, by contrast, his teachers noted numerous absences and an outright refusal to finish a project. He was also inconsistently medicated toward the end of that year. The IHO appears to have believed that E.D. was

deliberately underperforming toward the end of the year, given that his parents signed their contract with Winston Prep during the final marking period; the SRO did not make any such finding, but focused instead on the many indicators of progress (if inconsistent progress) that E.D. had enjoyed during the 2006-2007 school year. There is ample evidence in the record to support the SRO's finding that E.D's lower grades toward the end of the 2006-2007 school year—at a time when his parents had already decided to remove him from the public school— did not outweigh the evidence of progress that he showed throughout the school year or the satisfactory showing he made on his state tests.

### The CSE's Recommendations Addressed E.D.'s Social and Emotional Needs

The SRO also found that the CSE addressed E.D.'s attention issues in its program recommendations. The CSE clearly recognized the impact that E.D.'s attention deficit hyperactivity disorder ("ADHD") had on his academic functioning; it plainly considered Dr. Kant's evaluation, which discussed the impact of E.D.'s ADHD on his school functioning. (T.64).

One thing was evident to those who worked with E.D.: he was demonstratively more focused when he was medicated. His teacher testified that she could tell when he was on his medication and when he was not. (T. 406). During the period leading up to the 20072008 school year, E.D. was not medicated on a consistent basis. (T.70). This information was shared with the CSE team.

The CSE, however, recommended a program that addressed E.D.'s attention issues regardless of his medication status. Modifications to his program call for refocusing and preferential seating. The small student to special-education-teacher ratio in each of his academic classes was a recognition that E.D. needed close monitoring.

Additionally, the CSE appropriately recommended counseling for the 2007-2008 school year so that the psychologist could work with E.D. on his impulsivity. The counseling was intended to address one of the constant themes of all of the reports and evaluations presented to the CSE: that E.D. saw himself as "different" and that his perception of how the students around him think of him was not necessarily accurate. The CSE, therefore, appropriately recommended a group counseling session on a weekly basis. The CSE who met to develop the 2008-2009 recommendation actually increased the counseling, based upon reports from Winston Prep that E.D. was still struggling with social skills problems, impulsivity and deregulation, even in the private school setting. (T.219).

This related service was an important component to E.D.'s program. (IHO Dec. p. 76, 78; SRO Dec. pp. 29, 32, 33). As Dr. Kant noted, the CSE made this recommendation to "continue the ongoing work of these specific areas, frustration tolerances, impulsivity and social skills training." (T.316). Clearly, from the reports of E.D.'s teachers, the information provided by Plaintiffs, and the information reported by his Winston Prep teachers, E.D.'s behaviors as they related to impulsivity and his ability to interact with his peers greatly impact his academic performance. Concentration on these needs was paramount to support him in the classroom.

### The Goals Set for E.D. were Appropriate

The CSE developed a current profile of E.D.'s academic needs through review of extensive evaluation, review of reports from his teachers (both District teachers and those at Winston Prep) and an independent evaluator. The IEPs here under review contain a detailed description of E.D.'s then current levels of academic performance and set forth specific expectations for progress through annual goals. These goals are specific enough to provide

E.D.'s teachers, speech-language therapist and counselor with direction regarding the
expectations of the CSE.

Courts have held that goals should identify the extent or level to which the student would
demonstrate identified skills, behavior or knowledge. *W.S. v. Rye City School District*, 454 F.
Supp. 2d 134 (S.D.N.Y. 2006). However, even where certain goals are overly broad, courts have
found an IEP to be satisfactory where short-term objectives concretely outline targeted sub-
skills, identify criteria for mastery, set forth procedures to be used for measuring progress and
specify a date by which that progress was to be made. (*Id.*).

Plaintiffs contend that the goals set forth in the IEP were cut and pasted from an earlier
IEP (Pl. Moving Br. at 19); but the short answer to this is that the child needed to continue
working on the same skills, and the CSE's increased expectation that E.D. meet certain
benchmarks without assistance, rather than with moderate assistance, makes the goals "new"
within the meaning of IDEA.

The SRO found that the goals developed by the CSE for the IEPs in question were
measurable and aligned with E.D.'s needs. (SRO Dec. pp. 27, 28, 37). Ms. Burke testified at
length as to how each goal was to be measured. (T.411-23). In terms of his social and emotional
goals, Dr. Kant testified specifically as to how she would have assessed E.D.'s progress towards
each of the goals set forth in his IEP. (T.315-16). The SRO specifically ruled that each of the
annual goals addressed the student's needs  and specified which type of service provider would
be primarily responsible for implementing each goal with the student with respect to study skills,
reading, mathematics, speech-language skills and social/emotional behavioral skills. (SRO Dec.
27-28, 37). The law requires no more.

## The CSE's Recommendations were Appropriate and
## in the Least Restrictive Environment

The recommended programs provide E.D. with an education in the least restrictive environment appropriate for his needs. The IEPs call for E.D. to be educated with his mainstream, typical peers, with the support of special education teachers and/or instructional assistants at all times in his content area classes. Significantly, E.D. would have been exposed to non-disabled peers in all aspects of the recommended program. This exposure, coupled with the support the IEP provides, was designed to allow E.D. to receive exactly what the IDEA requires—an educational benefit in the least restrictive environment.

As set forth above, a CSE's recommendation will be deemed appropriate if it addresses each of the student's documented needs in a way that would allow him to make meaningful progress. The SRO found that E.D.'s recommended programs do just that – they properly address, each of E.D.'s needs with sufficient levels of support. (SRO Dec. pp. 26-27, 35-36; IHO Dec. pp. 78-79). Academically, the IEPs make recommendations to support his reading, writing and math deficiencies. E.D.'s curriculum and homework were to be modified to provide him with his grade-level curriculum on his instructional level. (T. 221). His homework was to be modified both in terms of content and amount, so that he could successfully complete his assignments independently. Importantly, the SRO determined that the recommended programs meaningfully address his impulsivity and attention issues, through program modifications, testing accommodations and counseling. (SRO Dec. pp. 28, 38).   The SRO ruled that the CSE properly insured that E.D.'s social skills problems were to be worked on in both individual and group counseling. (SRO Dec. pp. 32, 33, 38). The SRO also determined that the CSE clearly met its obligation to recommend an appropriate program for E.D. in the least restrictive environment.

Given the thorough and well-reasoned opinion of the SRO, and considering the record that provided the basis for that determination, I conclude that the SRO's ruling is entitled to deference, and find that the District offered E.D. a free and appropriate education for the 2007-2008 and 2008-2009 school years.  (SRO Dec. pp. 33-4, 37, 39).

### Procedural Requirements

In addition to challenging the adequacy of the IEP, Plaintiffs argue that certain procedural defects in the process of coming up with the IEPs require that they be deemed inadequate. However, not every procedural error in the development of an IEP renders it inadequate under the IDEA.  *See A.C. ex rel. M.C.*, 553 F.3d at 171, *citing Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377, 381 (2d Cir. 2003); *see also M.F. v. Irvington Union Free Sch. Dist.,* 719 F. Supp. 2d 302, 308-09 (S.D.N.Y. 2010). To deny a FAPE, the procedural inadequacy(ies) must have: "(1) impeded the child's right to a FAPE, (2) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE to the child, or (3) caused a deprivation of education benefits." *M.F., Id.* at 308, *citing* 20 U.S.C. §1415(f)(3)(E)(ii). The focus of this inquiry is on whether the parents had an adequate opportunity to participate in the development of the IEP.  *T.P. ex rel. S.P.,* 554 F.3d at 253, *citing Cerra,* 427 F.3d at 192.

In their summary judgment motion, the Plaintiffs assert that (a) there was no school psychologist present at the subcommittee of the committee on special education (hereinafter the "Sub-CSE") for the 2008-2009 IEP, (b) there was no speech and language therapist present at the Sub-CSE for the 2008-2009 IEP and (c) the District never fully implemented a behavior improvement plan ("BIP") regarding E.D.'s classroom behavior—all of which constitute procedural errors that denied E.D. a FAPE.  Significantly, both the SRO and the IHO specifically rejected these contentions.  (SRO Dec. at pp. 29-30, 34-35; IHO Dec. at pp. 59-60).  The SRO

rejected Plaintiffs' arguments, finding that the 2008-2009 Sub-CSE was properly constituted and the BIP was fully implemented. (*Id.*). Upon review, I agree that no procedural deficiencies warrant finding that the District failed to offer a FAPE to E.D. for the 2007-2008 and/or the 2008-2009 school year.

### The Sub-CSE for the 2008-2009 IEP was Properly Constituted

A Sub-Committee on Special Education is authorized to perform all functions of a regular CSE under N.Y. Education Law §4402. 8 N.Y.C.R.R. § 200.3(c)(3). However, there is a limitation—the Sub-CSE may perform the functions of the CSE except when a student is considered for initial placement in a special class, a special class outside of the student's school of attendance is recommended or considered, or a school primarily serving students with disabilities or a school outside of the student's district is recommended or considered. 8 N.Y.C.R.R. § 200.3(c)(4).

The Plaintiffs contend that to be properly constituted, the Sub-CSE for the 2008-2009 IEP had to include a school psychologist. (Plaintiffs Moving MOL, p. 13). Furthermore, the Plaintiffs contend that the failure of the school psychologist to attend was compounded by the fact that the District did not have a speech and language therapist present. (*Id.*) However, the Plaintiffs do not provide any legal justification for their assertion that a speech and language therapist is a required member of the Sub-CSE. The District argues that neither a school psychologist nor a speech language therapist was required to be a member of the 2008-2009 Sub-CSE, so that the 2008-2009 Sub-CSE was in fact properly constituted.

The SRO found that the lack of a speech and language specialist at the Sub-CSE meeting did not rise to the level of a denial of a FAPE. (SRO Dec. p. 34). The New York State regulations do not require a speech and language therapist to be part of a committee on special

education or a Sub-CSE. 8 N.Y.C.R.R. § 200.3 (a)(1); 8 N.Y.C.R.R. §200.3(c)(2). Furthermore, while a psychologist is a required member of a CSE, it is clear under the Commissioner's Regulations that a school psychologist is only a required member of the Sub-CSE when "a new psychological evaluation is reviewed or a change to a program option with a more intensive staff/student ratio . . . is considered." 8 N.Y.C.R.R. § 200.3(c)(2)(v). During the Sub-CSE meeting for the 2008-2009 IEP, no new psychological evaluation was reviewed. Nor was a more intensive program considered for E.D. Thus, the SRO agreed with the IHO that the 2008-2009 IEP was developed by a properly constituted Sub-CSE, as authorized under the Regulations of the Commissioner of Education. (SRO Dec. p. 35; IHO Dec. p. 59-60).

In the instant action, the Plaintiffs fully participated in the CSE process and have never alleged otherwise. Plaintiffs have not established that the lack of either a school psychologist or speech and language therapist denied them the ability to fully participate in developing the 2008-2009 IEP. Such an allegation is necessary. Courts in this Circuit have upheld the validity of IEPs developed by improperly constituted CSEs when it is found that the parents were able to fully participate in the CSE process. *See e.g. A.H. ex rel. J.H. v. Department of Educ. of City of New York*, 2010 WL 3242234, *2 (2d Cir. Aug. 16, 2010); *M.P.G. ex rel. J.P. v. New York City Dep't of Educ.*, 2010 WL 3398256, *8-9 (S.D.N.Y. Aug. 27, 2010).

### The BIP was Properly Implemented

When a student's behavior impedes his or her learning or that of others, the CSE must consider positive behavioral interventions and supports, and other strategies, to address such behavior. 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i); *see also J.A. v. East Ramapo Cent. Sch. Dist.*, 603 F. Supp. 2d 684, 689 (S.D.N.Y. 2009). The Plaintiffs contend that

the BIP was not properly implemented, thereby causing the IEP to be procedurally and

substantively defective. (*See* Plaintiffs' Moving MOL, p.14).

However, the SRO specifically found that the Record demonstrated otherwise and that

the BIP was properly implemented. (SRO Dec. p. 29). The school psychologist, Dr. Alyssa

Kant, testified that she was part of the team of professionals that worked with E.D. during the

2006-2007 school year. (Tr. 289-290). In this role, she observed E.D. in various classes. She

testified that at times he was quite distracted by his surroundings both internally and externally

and demonstrated an inconsistent ability to remain focused and attentive. (Tr. 290-291; SRO

Dec. p. 30). Based upon these behaviors, Dr. Kant explained that the team assessed those

behaviors and created an informal behavior chart which identified targeted behavior areas,

focused on them, and rated them so E.D. would become more aware of his own behavior within

the classroom setting. (Tr. 291, 292-296; SRO Dec. p. 30). Thereafter, the team of professionals

working with E.D. developed a formal functional behavioral assessment ("FBA")/ BIP. (Tr. pp.

291-292; Dist. Ex. 32 at p. 1; SRO Dec. p. 30). The team developed the FBA/BIP by first

selecting a behavior of concern to focus on, which they determined was his energetic personality,

impulsivity and hyperactivity. (Tr. p. 294). The team considered how this behavior interfered

with his progress and organizational skills in the classroom. (*Id.*). The team then reviewed his

current IEP, looked at the informal behavior charts and took E.D.'s strengths into account. (*Id.*).

The team decided that one target behavior the FBA/BIP would focus on would be disruptive

behavior in class, since this would often interfere with E.D.'s own progress, as well as his

classmates. (*Id.*). Another target behavior the team focused on dealt specifically with E.D.'s

impulsivity and running on school grounds. (Tr. 295). Then, by observing him and collecting

information on the data chart, the team then quantified the frequency and duration of that

behavior. (Tr. 294). As a result, the team developed a BIP that focused specifically on the disruptive behavior. (Tr. pp. 294-295). The team also developed charts to map his behavior in the identified three areas and three behaviors, with E.D.'s teachers rating those behaviors based on E.D.'s level of effort. (Tr. p. 295; SRO Dec. p. 30).

Dr. Kant testified that the teachers would turn the chart into her at the end of each week, and she would then review it with E.D. (Tr. 295; SRO Dec. p. 30). Dr. Kant further testified that she consulted and reviewed the FBA with E.D.'s mother, who did not have any questions regarding the administration of the resultant BIP. (Tr. pp. 296-97). Dr. Kant shared E.D.'s progress with the Plaintiffs and engaged in active discussions with E.D. concerning the information on the behavior monitoring document. (Tr. pp. 297, 298, 300).

The FBA/BIP was also reviewed during the April 2007 Sub-CSE meeting (which Dr. Kant did attend), and the BIP was added to the student's program for the 2007-2008 school year. (Tr. pp. 66, 76, 118). The FBA/BIP would have been carried over into the 2008-2009 school year had E.D. attended the District's schools. (Tr. P. 70, 118; SRO Dec. p. 30). The SRO's conclusion that the District appropriately addressed E.D.'s behavior is supported by ample record evidence and will be given due deference.

To the extent that the parents are pressing their objection to the way their son was seated on the school bus, they failed to preserve the issue properly, for the reasons set forth at pages 22-23 of the SRO's well-reasoned decision. 20 U.S.C. §§ 1415(c)(2)(E), (f)(3)(B); 34 C.F.R. §§ 300.508(d)(3), 300.511(d); and 9 N.Y.C.R.R. §§ 200.5(i)(7)(i) and (j)(1)(ii). The Court will, therefore, not address the matter.

**Adequacy of Winston Prep as an Alternative Placement and
equitable Considerations Relating to Tuition Reimbursement**

Because the Court affirms the SRO on the issue of the District's provision of a FAPE to

E.D. for the relevant school years, it is not necessary to reach, and I do not reach, the issue of

whether the parents – who bear the burden – have established the appropriateness of Winston

Prep as an alternative placement, or whether equitable considerations bar tuition reimbursement.

## **Conclusion**

The Court directs the Clerk to DENY the motion at Docket No. 13 and GRANT the cross

motion at Docket No. 10.  The Clerk is instructed to enter judgment in favor of the defendant

The Bedford Central School District and to close the case.

Dated:  September 22, 2011

_____
U.S.D.J.

BY ECF TO ALL COUNSEL